UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| ROBERT J. GARDNER, et al., | Case No. 2:17-cv-00352-PAL |
| Plaintiffs, | |
| v. | **ORDER** |
| LAS VEGAS METROPOLITAN POLICE DEPARTMENT, et al., | (Mots. Summ. J. – ECF Nos. 47, 48) |
| Defendants. | |

Plaintiffs Robert J. Gardner, Kim Gardner, and the Estate of Garrett E. Gardner (collectively, "Plaintiffs"[1]) bring this lawsuit under 42 U.S.C. § 1983 alleging violations of their son Garrett's constitutional right to adequate medical care as a pretrial detainee at the Clark County Detention Center ("CCDC"). This case was referred for a determination and entry of final judgment pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. Reference Order (ECF No. 13).

Before the court are Motions for Summary Judgment (ECF Nos. 47, 48) filed by Defendants NaphCare and the Las Vegas Metropolitan Police Department ("LVMPD"). The court held a hearing on these Motions on February 27, 2019. Lyssa Anderson, counsel for LVMPD, John Orr, counsel for NaphCare, and Lauren Calvert, counsel for Plaintiffs appeared. The court has considered the Motions, LVMPD's Notice of Manual Filing (ECF No. 49) and Supplement (ECF No. 50), Plaintiffs' Responses (ECF Nos. 51, 52), NaphCare and LVMPD's Replies (ECF Nos. 55, 56) and Joinders (ECF Nos. 57, 58), and the arguments of counsel at the hearing. For the reasons explained in this order, the court grants both defendants' motions for summary judgment.

---

[1] Plaintiffs Robert and Kim Gardner are the parents of the decedent, Garett Gardner, and the co-special administrators of Garett's estate. To avoid confusion with his father, this order will refer to the decedent as Garrett.

1

The threshold inquiry in a § 1983 suit requires the court to identify the specific constitutional right at issue. *Manuel v. City of Joliet*, --- U.S. ---, 137 S. Ct. 911, 920 (2017). Plaintiffs have asserted § 1983 claims for deprivation of their son's right to receive adequate medical care while in custody. Specifically, Plaintiffs allege that the defendants were aware that Garrett was suffering from metastatic melanoma and polymicrobial sepsis, which ultimately caused Garrett's death, but chose not to provide medical care.

After identifying the constitutional right at issue, the court must determine "the elements of, and rules associated with, an action seeking damages for its violation." *Id.* To prevail, Plaintiffs must show the defendants were deliberately indifferent to Garrett's serious medical needs. Deliberate indifference requires "something more than mere negligence," and "something less than acts or omissions for the very purpose of causing harm with the knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 841 (1994). A plaintiff making a deliberate indifference claim against a municipality must show "*deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Horton by Horton v. City of Santa Maria*, 915 F.3d. 592, 603 (9th Cir. 2019) (quoting *Board of Comm'rs of Byron County v. Brown*, 592 U.S. 397, 415 (1997)). Deliberate indifference is a "stringent standard of fault." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Under long-established Supreme Court precedent, "liability for negligent harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

The court finds that Plaintiffs have not shown the defendants were deliberately indifferent to Garrett's serious medical needs. The uncontroverted evidence is that Garrett's death was caused by metastatic malignant melanoma, which was not diagnosed until doctors at University Medical Center ("UMC") performed an operation and a biopsy while treating Garrett's bacterial infection. The admissible medical opinion testimony in the record is that the metastatic malignant melanoma caused the polymicrobial sepsis.

There is no admissible evidence in the record that any employee or official of LVMPD or NaphCare was aware that Garrett had a serious physical illness until January 21, 2015, when Garrett was discovered by a corrections officer lying on a mattress on the floor while the

corrections officer was delivering Garrett's dinner tray. It is undisputed that Officer O'Barr asked Garrett if he was okay. Although Garrett responded that he was okay, O'Barr noticed that the room smelled of urine and feces and Garrett's arm appeared swollen. O'Barr immediately requested a medical assessment. A nurse responded, evaluated Garrett, requested a crash cart, and summoned an ambulance to transport Garrett to UMC's emergency room ("ER"). Naphcare records, which the parties stipulated are admissible, establish that numerous medical providers treated Garrett more than 60 times during the seven months he was incarcerated at CCDC. There is simply no admissible evidence in the record that there were any external signs or symptoms that Garrett was suffering from a serious physical illness until he was discovered on the floor the evening of January 21, 2015, and immediately transported to UMC. Plaintiffs have therefore failed to establish that either defendant was deliberately indifferent to Garrett's serious medical needs.

## BACKGROUND

This is a tragic case. Garrett was 29 years old when he was arrested for open and gross lewdness and booked into CCDC on July 19, 2014. Garrett suffered from paranoid schizophrenia and was homeless at the time of his arrest. NaphCare medical records submitted with the parties' moving and responsive papers establish that Garrett was medically assessed during booking and treated for schizophrenia, but often refused his medication. Twice during his incarceration at CCDC he expressed suicidal ideation and was assigned to segregated housing and placed on suicide watch. NaphCare and CCDC records produced in discovery indicate that Garrett was seen by numerous medical professionals including nurses, psychiatrists, and medical doctors more than 60 times during his incarceration at CCDC prior to his hospitalization on January 21, 2015. Garrett died at UMC on January 31, 2015, following a 10-day hospitalization.

## I.   THE COMPLAINT

Plaintiffs initially filed a complaint in state court on January 17, 2017, against LVMPD, the police department that runs CCDC, and NaphCare, a private corporation who operated as the healthcare provider at CCDC. Compl. (ECF No. 1-1) at 9, ¶¶ 6, 7. LVMPD removed the case to this court. Petition for Removal (ECF No. 1). The complaint alleges three claims under 42 U.S.C. § 1983 for: (1) inadequate medical care/deliberate indifference to Garrett's serious medical needs

against NaphCare and the CCDC (LVMPD) defendants; (2) *Monell*[2] municipal liability against LVMPD for deliberate indifference to serious medical needs; and (3) intentional infliction of emotional distress under Nevada law against both defendants.[3] Plaintiffs allege that while Garrett was incarcerated at CCDC he was "suffering from a medical emergency with the potential for significant morbidity and mortality." *Id.* at 8–9, ¶¶ 3, 5. Plaintiffs further allege that defendants had knowledge of "his polymicrobial sepsis and metastatic melanoma, which ultimately caused the untimely death" but "chose not to provide medical care." *Id.* at 9, ¶ 5.

## II. THE PARTIES' POSITIONS

### A. NaphCare's Motion for Summary Judgment (ECF No. 47)

NaphCare moves for summary judgment arguing that Plaintiffs' § 1983 claim fails because there is no evidence showing any NaphCare employee or official was subjectively aware of Garrett's cancer, or that he was suffering from a serious medical condition that needed attention before his hospitalization on January 21, 2015. NaphCare's medical records show that its employees were aware of Garrett's mental health problems, which were addressed and treated during his incarceration. NaphCare records also show Garrett was assessed and never complained of anything that would lead anyone to suspect he needed medical care. Naphcare's motion also cites UMC hospital records to support its argument that Garrett "only reached out for help just before he was sent out to the hospital." Mot. at 9:17–19.

Plaintiffs oppose the motion arguing there are genuinely disputed facts about whether NaphCare chose not to provide medical care to Garrett. Resp. (ECF No. 51). Plaintiffs argue that medical care claims brought by pretrial detainees against individual defendants for inadequate medical care impose an objective deliberate indifference standard, citing *Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018). This is a case-specific inquiry turning on the facts and circumstances of each case. Under *Gordon*, a plaintiff must "prove more than negligence, but less than subjective intent—something akin to reckless disregard." *Id.* Plaintiffs argue that

---

[2] *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978).

[3] The complaint made allegations against multiple individual Does of CCDC and NaphCare. However, plaintiffs did not move to amend the complaint to substitute individuals for the Does during litigation.

although they did not bring claims against any individual defendants, *Gordon* makes clear that its newly-announced standard still bears on this case—Plaintiffs may prevail on a § 1983 claim against municipal entities by showing that one or more individuals violated their rights by exhibiting "reckless disregard" for their wellbeing, and that those violations are attributable to the defendants.

Plaintiffs acknowledge that a threshold element of a claim for deficient medical care requires a showing that the healthcare problem complained of is a "serious medical need," citing *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976). A medical condition that has been diagnosed by a physician as requiring treatment is a serious medical need. A serious medical need also exists for a medical problem that is so obvious that a lay person would easily recognize the necessity for a doctor's attention. Plaintiffs argue the defendants' conduct in this case was objectively unreasonable.

Plaintiffs also argue that in evaluating the § 1983 claims of individuals with mental illness or mental incapacity, courts apply a heightened standard. Citing *Youngberg v. Romeo*, 457 U.S. 307 (1982), and *Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003), Plaintiffs argue that because of Garrett's mental incapacity, their claims should be evaluated under a lesser gross negligence standard rather than a deliberate indifference standard.

Plaintiffs contend that the NaphCare contract to provide medical care to CCDC detainees was designed to boost profits rather than provide quality medical care and incentivized it to provide as little medical care as possible. A reasonable fact finder could conclude that a reduced level of medical care was virtually inevitable as a result of the terms of the NaphCare contract. Plaintiffs also claim NaphCare failed to train its employees and CCDC corrections officers to identify detainees with infectious diseases. Plaintiffs assert that NaphCare failed to identify or treat Garrett's infection because its policies and procedures are deficient and only seek to protect NaphCare employees and jail staff—not detainees. Plaintiffs point to evidence in the record indicating that Garrett was not tested for tuberculosis or other highly communicable diseases when he was taken into custody in July 2014 because he had been tested for tuberculosis during a prior incarceration within a year of his July 2014 arrest and detention at CCDC. Plaintiff s also point to

testimony in the record by LVMPD detention facility staff that they were not trained regarding communicable or infectious diseases.

Plaintiffs further argue that NaphCare's policies and procedures requiring inmates to self-report their medical problems are constitutionally deficient because Garrett's mental illness and learning disability made communication nearly impossible. The one time that Garrett managed to fill out a medical request or "kite" complaining of a dislocated back and his side was swelling and cramps and shortness of breath, NaphCare's staff responded by providing him with Motrin or Tylenol from the canteen.

Plaintiffs point to Garrett's autopsy photos which show his extremities had "ballooned to a painfully obvious size" and argue it is "impossible to imagine" how the medical conditions depicted in the autopsy photos could be ignored. Additionally, Plaintiffs maintain UMC medical records show that Garrett had been complaining of weakness throughout the day of his hospitalization, edema to his arm for the prior four weeks, chest pain for four weeks, that he had decreased oral intake over the prior six months, and that he had experienced trouble walking for two weeks prior to his hospital admission. Thus, the defendants must have been aware Garrett was suffering from a serious medical condition that required treatment before his hospitalization.

Alternatively, Plaintiffs argue that even if NaphCare's policies meet constitutional standards, the physical manifestations of Garrett's infection would have been obvious if the defendants had followed their own policies regarding inmate hygiene. If either defendant had not allowed Garrett to become extremely unkempt and disheveled, Plaintiffs argue, the physical manifestations of his infection and cancer would have been "painfully obvious."

NaphCare argues in its reply that Plaintiffs' reliance on the new test announced in *Gordon* is misplaced as it only applies to claims brought by pretrial detainees against individual defendants. NaphCare contends that because Plaintiffs have only sued NaphCare and none of its employees or officers, and because NaphCare is not a municipal entity, *Gordon* does not apply. NaphCare also argues that Plaintiffs have not identified a single instance in which Garrett was deprived of medical care, or a single instance of any NaphCare employee who was recklessly indifferent towards Garrett. Thus, Plaintiffs have failed to meet their burden of showing that any individual working

6

for NaphCare, or NaphCare itself, was deliberately indifferent to Garrett's medical needs. Here, Garrett "did not subjectively make his medical needs known, nor did he display any objective signs of needing medical attention." Reply (ECF No. 56) at 4:22–23.

**B. LVMPD's Motion for Summary Judgment (ECF No. 48)**

LVMPD moves for summary judgment arguing that Plaintiffs' § 1983 claim fails because there is no evidence showing that Garrett suffered a constitutional deprivation or that an LVMPD policy caused any deprivation. LVMPD maintains Plaintiffs cannot demonstrate that it was deliberately indifferent to Garrett's serious medical needs. Citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991), LVMPD argues that the inadvertent failure to provide adequate medical care, or a negligent diagnosis does not establish the requisite culpable state of mind for a deliberate indifference claim. Rather, the Supreme Court has required plaintiffs making a deliberate indifference claim against a municipal entity to show unnecessary and wanton infliction of pain, or that the failure to provide medical care is "repugnant to the conscience of mankind," citing *Estelle*, 429 U.S. at 104–06. Plaintiffs cannot make this showing because, while Garrett was at CCDC for approximately seven months, he was seen by medical providers at least 66 times before he exhibited outward signs and symptoms of a serious illness and was immediately taken to UMC.

LVMPD also asserts that Plaintiffs have not shown any unconstitutional policy, practice, or procedure, or that policy makers at LVMPD directed, encouraged, allowed, and/or ratified its officers' misconduct towards Garrett. Rather, plaintiffs infer that because Garrett died in custody, LVMPD as an organization refuses to treat detainees for serious medical conditions and willfully blinds itself to an inmate's past medical history. Plaintiffs have no evidence that LVMPD had an unconstitutional policy or that LVMPD ratified an officer's unconstitutional conduct. LVMPD has numerous constitutionally adequate policies to provide for the serious medical needs of CCDC inmates. Plaintiffs have no evidence indicating that LVMPD does not follow these policies, or that the policies are constitutionally deficient. The evidence in this case shows that Garrett's malignant melanoma was not discovered until UMC doctors operated on him. Garrett had no external signs of his cancer and never reported to CCDC or NaphCare staff that he felt unwell. As soon as it became apparent that Garrett was unwell, Officer O'Barr notified a nurse and Garrett

was transported to UMC. Thus, Plaintiffs cannot prevail on a § 1983 claim for deliberate indifference to Garrett's serious medical needs.

Plaintiffs respond that there are genuinely disputed facts regarding LVMPD's failure to train its officers to follow policy, which amount to deliberate indifference to Garrett's constitutional right to receive adequate medical care. Resp. (ECF No. 52). Plaintiffs argue that Garrett contracted sepsis/flesh-eating bacteria while incarcerated at CCDC. It is undisputed Garrett did not take medication to treat his paranoid schizophrenia while incarcerated. Plaintiffs do not assert a § 1983 claim for failure to provide adequate medical care for his mental illness. However, the defendants cannot blame Garrett for not identifying, diagnosing, and alerting them of his deadly cancer and sepsis.

Plaintiffs claim it is undisputed that NaphCare relies on LVMPD corrections officers to identify medical problems, illness, and emergencies, but they are not given adequate medical training. LVMPD corrections officers are not trained medical personnel. If an officer believes a pretrial detainee may be experiencing a medical episode and/or medical issue, LVMPD policy requires the officer to request NaphCare's medical personnel to determine how the situation should be handled. LVMPD has therefore delegated final decision-making authority for medical care and treatment to NaphCare. However, LVMPD's constitutional duty to provide adequate medical treatment to those in custody is nondelegable and LVMPD cannot avoid liability because it contracted out prison medical care.

Plaintiffs argue that the NaphCare fixed-cost contract is structured in a way to provide an incentive to minimize the cost of care to maximize profits. Plaintiffs also claim LVMPD was aware of prior allegations of deficient care provided by NaphCare at a detention facility in northern Nevada and in another state. LVMPD accepted the lowest bid presented by NaphCare, and thus a reasonable fact finder could conclude that a deficient level of medical care was the inevitable result of this contract.

Plaintiffs assert that LVMPD failed to adequately implement or follow a protocol of handling communicable disease. LVMPD's policies and procedures requiring inmates to self-report medical problems is also constitutionally deficient. This is especially true where, as here,

8

Garrett "was thought to lack capacity to assist an attorney in his own defense." Plaintiffs reiterate arguments made in response to NaphCare's summary judgment motion that UMC records establish Garrett had serious medical needs before his hospitalization and if the defendants had followed their own internal policies requiring inmate hygiene, the physical manifestations of his infection and cancer would have been painfully obvious.

LVMPD's Reply (ECF No. 55) argues that Plaintiffs have failed to identify any individual who violated Garrett's right to adequate medical care. LVMPD also argues that Plaintiffs cannot show Garrett suffered a constitutional violation because all of the evidence in the case shows Garrett had stage four malignant melanoma, he never complained of symptoms associated with cancer, he had no external manifestations of skin cancer, and no one observed Garrett in serious pain before Officer O'Barr called for medical attention on January 21, 2015. LVMPD also contends it is undisputed from evidence in the record that Garrett did not have necrotizing fasciitis, and that the polymicrobial sepsis diagnosed at UMC was a direct result of his cancer.

## DISCUSSION

**I.    APPLICABLE LEGAL STANDARDS**

### A.  Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment when the pleadings, discovery and disclosure materials, and any affidavits on file show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).[4]  "The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). However, summary judgment is not appropriate where reasonable minds could differ on the material facts at issue. *Id.* In evaluating a summary judgment motion, a court views all facts and draws all

[4] All references to a "Rule" or the "Rules" in this order refer to the Federal Rules of Civil Procedure.

inferences in the light most favorable to the nonmoving party. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 960 (9th Cir. 2011). However, only evidence that may be admissible at trial may be considered in ruling on a summary judgment motion. Fed. R. Civ. P. 56(c).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence showing the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Where the moving party does not have the ultimate burden of persuasion at trial, it "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its initial burden, the moving party must either (i) present admissible evidence "negating an essential element of the nonmoving party's claim or defense," or (ii) "show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970); *Nissan Fire & Marine*, 210 F.3d at 1102–03.

If the moving party satisfies Rule 56's initial burden of production, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.").

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Bank of America v. Orr*, 285 F.3d 764, 773 (9th Cir. 2002). The Ninth Circuit has "repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment." *Id.* Documents may be authenticated through (1) the personal knowledge of a party who attests that the document is what it purports to be, or (2) any other manner permitted by Federal Rules of Evidence 901(b) or 902. Documents authenticated through personal knowledge

10

must be attached to or referenced either in an affidavit signed by a person with personal knowledge about the document (such as the custodian of the document kept in the ordinary course of a business) or in properly authenticated deposition testimony in which the same information was elicited. *Orr*, 285 F.3d at 773–74 (deposition transcripts are authenticated "by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted").

In this case, neither defendant complied with the requirements to authenticate or lay a foundation for the admissibility of the supporting exhibits submitted with their summary judgment motions. Counsel for NaphCare conceded during oral argument that NaphCare's motion for summary judgment did not comply with the requirements of Rule 56(c) or LR 56-1, which requires a statement of undisputed facts.

After its motion for summary judgment was filed, LVMPD filed a Supplement (ECF No. 50) attaching the declarations of various custodians of records and the affidavit of counsel. Specifically, LVMPD supplemented its motion with the declarations of custodians of records for LVMPD: Marleen Srok, authenticating Exhibit A; Melanie Molinaro, authenticating Exhibits B, D, and F; Sergeant Sheree Butler, authenticating Exhibit C; Angela Taylor, authenticating Exhibits G, H and J; and Jerry MacDonald, authenticating Exhibit O. The affidavit of counsel purports to authenticate Exhibits I, K, L, N, P, and Q—the depositions of various individuals and experts deposed in this case. However, the declaration says nothing more than she is counsel for LVMPD, and these exhibits "are true and correct copies made and obtained through discovery in this matter and this Court may take Judicial Notice of them." Counsel's affidavit does not meet the applicable Ninth Circuit standard for authenticating and establishing admissibility of these exhibits.

During the hearing on the summary judgment motions, the parties stipulated to the authenticity and admissibility of the NaphCare and UMC records, which were submitted as exhibits to the moving and responsive papers. However, counsel for Plaintiffs stated she would not stipulate that the medical records were complete. She did not articulate any reason to support her belief the records may be incomplete.

At the conclusion of the hearing, the court orally granted summary judgment in favor of NaphCare and LVMPD on Plaintiffs' claim for intentional infliction of emotional distress for the

reasons stated on the record and took the remaining issues under advisement.

**B. Claims Under § 1983**

1. Section 1983 Generally

42 U.S.C. § 1983 provides a mechanism for the private enforcement of substantive rights conferred by the Constitution and federal statutes. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). To succeed on a claim under § 1983, a plaintiff must establish: (1) his or her his civil rights were violated, (2) by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48–49 (1988). A person acts under color of state law when he or she "exercises power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49. The "threshold inquiry in a § 1983 suit" requires courts "to 'identify the specific constitutional right' at issue." *Manuel v. City of Joliet*, --- U.S. ----, 137 S. Ct. 911, 920 (2017). "After pinpointing that right, courts still must determine the elements of, and rules associated with, an action seeking damages for its violation." *Id.*

2. Municipal Liability Under § 1983

Local governments (such as cities, counties, and other municipalities) and their officials are "among those persons to whom § 1983 applies." *Monell*, 436 U.S. at 690–91. A government entity may be found liable under § 1983 only when its policy, practice, or custom inflicts injury upon a plaintiff. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "A municipality may not be sued under § 1983 solely because an injury was inflicted by its employees or agents." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *Monell*, 436 U.S. at 694); *see also Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997) (under § 1983, municipalities may not be held liable for employees' acts on a *respondeat superior* or vicarious liability theory). There must be " 'a direct causal link between a municipal policy, practice, or custom and the alleged constitutional deprivation'." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir. 2016) (quoting *Canton*, 489 U.S. at 385). The custom or policy must be a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing the final policy in question. *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). A plaintiff making a deliberate indifference claim must

show "*deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019) (quoting *Board of Comm'rs*, 520 U.S. at 415). "Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Id.*

To establish municipal liability under § 1983, a plaintiff must show that: (i) he was deprived of a constitutional right; (ii) the defendant had a policy or custom; (iii) the policy or custom amounted to "deliberate indifference" to the constitutional right; and (iv) the policy or custom was the "moving force" behind the constitutional violation. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013). To meet these requirements, "the plaintiff must show both causation-in-fact and proximate causation." *Id.* (citation omitted). Stated differently, a plaintiff must show that an "official policy, custom or practice" on the part of the defendant was "the actionable cause of the claimed injury." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (citing *Harper v. City of Los Angeles*, 533 F.3d 1010, 1024 (9th Cir. 2008)).

Government entities may be held liable under four possible *Monell* theories: "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton*, 915 F.3d at 602–03. Municipalities may also be subject to *Monell* liability for "collective inaction," rather than the actions of individual officers. *Id.* (quoting *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002)). Under *Canton*,

> a plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation.

*Long*, 442 F.3d at 1185–86 (citing *Canton*, 489 U.S. at 387–89). To prove deliberate indifference for a municipality's omission, a plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation. *Canton*, 489 U.S. at 390, 396; *Farmer v. Brennan*, 511 U.S. 825, 841 (1994). This indirect route to municipal liability hinges not only on the existence of a policy that poses a substantial risk of serious harm, but also on the municipality's awareness of this risk. *Farmer*, 511 U.S. at 837; *Castro*, 833 F.3d at 1076. These "heightened requirements for establishing responsibility for a policy of omission

are necessary to avoid imposing respondeat superior liability, which would run afoul of *Monell*." *Tsao*, 698 F.3d at 1143 (citing *Board of Comm'rs*, 520 U.S. at 403–04).

Here, LVMPD does not dispute that it is a municipality, or that Plaintiffs' § 1983 deliberate indifference to medical needs claim against it is a *Monell* claim. However, NaphCare argues it is not subject to *Monell* liability because NaphCare is not a municipal entity, and Plaintiffs' arguments regarding NaphCare's policies are therefore "totally irrelevant in this action." Reply (ECF No. 56) at 5. It is undisputed that NaphCare is a private company that contracts with LVMPD to provide medical care for pretrial detainees at CCDC. During oral argument, counsel for Naphcare conceded that, as the contractor providing medical care for pretrial detainees at CCDC, Naphcare is a state actor. Every Circuit to have considered the matter, including the Ninth Circuit, "has concluded that the requirements of *Monell* apply to suits against private entities under § 1983." *Tsao*, 698 F.3d at 1139–40.[5]

### 3. Recent Developments in § 1983 Case Law Addressing Pretrial Detainees' Deliberate Indifference Claims

Recent developments in § 1983 jurisprudence impact this case. Historically, the constitutional guarantee of due process "has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). The Supreme Court has held that "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (emphasis added). Deliberate indifference requires "something more than mere negligence," and it "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Deliberate indifference is "a stringent standard of fault," requiring proof that a defendant "disregarded a

---

[5] Multiple decisions in this district have treated NaphCare as a municipality and analyzed § 1983 claims against it under *Monell*. *See, e.g.*, *Cabrera v. CCDC*, 2:12-cv-0918-RFB-CWH, 2016 WL 1449581, at *7 (D. Nev. Apr. 12, 2016) ("Cabrera's claim against NaphCare is a municipal liability claim under 42 U.S.C. § 1983."), *aff'd*, 690 Fed. App'x 468 (9th Cir. 2017); *Zeigler v. LVMPD*, 2:11-cv-1301-JAD-VCF, 2015 WL 355422, at *2 (D. Nev. Jan. 27, 2015); *Denson v. Gillespie*, 2:10-cv-0525-APG-VCF, 2015 WL 56037, at *2 (D. Nev. Jan. 5, 2015) ("For purposes of claims brought under § 1983, a private entity like NaphCare is treated as a municipality."); *Repass v. CCDC*, 2:13-cv-0237-APG-GWF, 2014 WL 335040, at *7 (D. Nev. Jan. 29, 2014); *Cavalieri v. LVMPD*, 2:11-cv-0351-ECR-CWH, 2012 WL 846466, at *7 (D. Nev. Mar. 13, 2012) (pre-*Tsao* decision applying *Monell* standard).

known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Board of Comm'rs*, 520 U.S. at 410).

Historically, the Supreme Court has analyzed § 1983 conditions of confinement claims brought by convicted persons and pretrial detainees under the Eighth and Fourteenth Amendments. The Eighth Amendment forbids "cruel and unusual punishments." U.S. Const. amend. VIII. Based on this prohibition, a state prisoner's conditions of confinement claims are subject to scrutiny under the Eighth Amendment. *Farmer*, 511 U.S. at 832; *see also Estelle*, 429 U.S. at 104 (prison officials' "deliberate indifference to serious medical needs of prisoners" violates the Cruel and Unusual Punishment Clause). Prior to conviction, a pretrial detainee is "protected by the Fourteenth Amendment's Due Process Clause … against jail conditions or restrictions that amount to punishment." *Olivier v. Baca*, 913 F.3d 852, 857–58 (9th Cir. 2019) (quotation omitted). "Under both clauses, the plaintiff must show that the prison officials acted with 'deliberate indifference'." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1068 (9th Cir. 2016) (en banc).

Until *Castro*, the Ninth Circuit interpreted the Supreme Court's § 1983 cases to require a singular standard for deliberate indifference claims brought by convicted prisoners and pretrial detainees. *E.g.*, *Simmons v. Navajo County*, 609 F.3d 1011, 1017 (9th Cir. 2010) (noting that courts apply standard even though the Fourteenth Amendment applies to pretrial detainees' claims rather than the Eighth Amendment). The standard has two components: an objective showing of a "serious medical need," and a subjective showing of a defendant's deliberate indifference to that need. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). A corrections official is deliberately indifferent under the subjective component, if "the official knows of and disregards an excessive risk to inmate safety; the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837 (addressing prisoner's Eighth Amendment conditions of confinement claim); *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837).

In *Kingsley v. Hendrickson*, --- U.S. ----, 135 S. Ct. 2466 (2014), the Supreme Court addressed the state of mind standard to be applied to a pretrial detainee's excessive force claim against several individual jail officers. The officers conceded they intended to use the force they

15

used. However, the parties disputed whether the force was excessive. The Supreme Court accepted certiorari to decide "whether to prove an excessive force claim, a pretrial detainee must show the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." *Id.* at 2470.

In *Kingsley*, the pretrial detainee maintained on appeal that the correct standard for judging an excessive force claim is objective unreasonableness. The officers contended the relevant legal standard should be subjective, *i.e.*, that a plaintiff must prove the use of force was applied maliciously and sadistically to cause harm. The Supreme Court held that "a pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473. The high court reasoned that this was consistent with its prior precedent holding that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Id.* (quoting *Graham*, 490 U.S. at 395 n.10). The Supreme Court recognized that in *Bell v. Wolfish*, 441 U.S. 220 (1979), it stated that excessive force amounting to punishment could consist of actions taken with an "expressed intent to punish." *Id.* (quoting *Bell*, 441 U.S. at 538). However, *Bell* went on to explain that even in the absence of an intent to punish, a pretrial detainee could prevail on an excessive force claim by showing that the actions are not "rationally related to a legitimate non-punitive government purpose" or that the actions "appear excessive in relation to that purpose." *Id.* (quoting *Bell*, 441 U.S. at 561).

The *Kingsley* opinion concluded that *Bell*'s focus on punishment "does not mean that proof of intent (or motive) to punish is required for a pretrial detainee to prevail on a claim that his due process rights were violated." 135 S. Ct. at 2473. Rather, "a pretrial detainee can prevail by providing only objective evidence that the challenged government action is not rationally related to a legitimate government objective, or that it is excessive in relation to that purpose." *Id.* at 2473–74 (citation omitted). The *Kingsley* court found the objective standard was workable, consistent with the pattern jury instructions used in several Circuits, and "adequately protects an officer who acts in good faith." *Id.* at 2474.

In *Castro*, the Ninth Circuit interpreted *Kingsley* and held that (1) an objective standard applies to a pretrial detainee's failure-to-protect claim, and (2) an objective standard applies to a

pretrial detainee's *Monell* claim for deliberate indifference against a municipal entity. The facts of the case are instructive. Castro was arrested and placed in a sobering cell. Several hours later jail officers placed a combative inmate in the same cell. The inmate severely beat and injured Castro, who then sued individual officers, the County of Los Angeles and the Los Angeles Sheriff's Department under § 1983 for violating his due process rights as a pretrial detainee to be protected from harm from other inmates. All defendants were found liable at trial.

On appeal, the Ninth Circuit addressed the claims against the individual defendants and the entity defendants. Addressing Castro's deliberate indifference claims, the Ninth Circuit first noted that convicted inmates who sue prison officials may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause, and pretrial detainees may sue under the Fourteenth Amendment's Due Process Clause. *Id.* 1067–68. Under both the Eighth Amendment and the Fourteenth Amendment, the plaintiff must show prison officials acted with deliberate indifference. *Id.* at 1068. The Ninth Circuit noted that the standard for proving deliberate indifference against individual defendants under the Eighth Amendment was well established, but the standard under the Fourteenth Amendment was less clear. *Id.*

In light of the Supreme Court's *Kingsley* decision, the en banc *Castro* court reevaluated the Ninth Circuit's prior holding in *Clouthier v. County of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010). *Clouthier* held that a single deliberate indifference test applied to § 1983 claims brought by convicted persons and pretrial detainees under both the Eighth Amendment and the Fourteenth Amendment. In *Clouthier*, the parents of a pretrial detainee sued an individual mental health specialist, sheriff's deputies, and the county, claiming the defendants had violated their son's due process rights by failing to prevent his suicide while in custody. The *Clouthier* decision held that a deliberate indifference standard applied to a pretrial detainee's condition of confinement/failure-to-address-medical-needs claim. *Id.* at 1242. *Clouthier* also held that this deliberate indifference standard incorporated a subjective test as articulated by the Supreme Court in *Farmer v. Brennon*, 511 U.S. 285 (1994). *Id.* However, in *Castro*, the Ninth Circuit acknowledged that *Kingsley* "cast that holding into serious doubt." 833 F.3d at 1068.

The Ninth Circuit first considered whether *Kingsley*'s holding applied to failure-to-protect

17

claims, noting that *Kingsley* "did not squarely address whether the objective standard applies to all kinds of claims by pretrial detainees including both excessive force and failure-to-protect claims." *Castro*, 833 F.3d at 1069. The Ninth Circuit found "there are significant reasons to hold that the objective standard applies to failure-to-protect claims." *Id.* First, § 1983 contains no state-of-mind requirement independent of the state of mind necessary to allege a violation of the underlying constitutional right. *Id.* (collecting cases). Second, both categories of claims arise under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Clause. *Id.* at 1069–70. Third, the *Kingsley* decision states that a pretrial detainee could prevail by providing objective evidence that the challenged governmental action is not rationally related to a legitimate government objective, or that it is excessive in relation to that objective. *Id.* at 1070. Thus, *Kingsley* did not limit its holding to excessive force claims, but its rationale also applied to § 1983 claims challenging governmental actions. *Id.*

For these reasons, the Ninth Circuit overruled *Clouthier* "to the extent it identified a single deliberate indifference standard for all § 1983 claims and to the extent that it required a plaintiff to prove an individual's subjective intent to punish in the context of a pretrial detainee's failure-to-protect claim." *Castro*, 833 F.3d at 1070. *Castro* held that after *Kingsley*, a pretrial detainee who asserts a due process claim for failure to protect must "prove more than negligence, but less than subjective intent—something akin to reckless disregard." *Id.* at 1071. Applying these principles, the Ninth Circuit then articulated the elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual.[6] *Id.*

After addressing the claims against the individual defendants, the *Castro* decision turned to the *Monell* claim against the entity defendants. The Ninth Circuit addressed and reaffirmed the vitality of established Supreme Court precedent holding: (1) a municipality may not be held liable for a § 1983 violation under a respondeat superior theory for the actions of its subordinates; (2) to

_____

[6] The elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer are: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries. *Id.* at 1071.

18

establish municipal liability, a plaintiff must show a "policy or custom" caused his injuries; and (3) a plaintiff must also show that the policy or custom of the municipality constitutes deliberate indifference to his constitutional rights. *Id.* at 1073 (citing *Monell*, 436 U.S. at 694; *City of Canton*, 489 U.S. at 392).

With regard to the deliberate indifference standard for municipalities, *Castro* reaffirms that a plaintiff must show notice: " 'Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied'." *Id.* at 1076 (quoting *City of Canton*, 489 U.S. at 396). Supreme Court precedent has strongly suggested it is "always an objective inquiry." *Id.* An objective standard "necessarily applie[s] to municipalities for the practical reason that government entities, unlike individuals, do not themselves have states of mind." *Id.* (quoting *Farmer*, 511 U.S. at 841 ("[C]onsiderable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official.")). The *Castro* decision noted that Ninth Circuit precedent also recognizes that an objective standard applies. *Id.* (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1195 (9th Cir. 2002)). To the extent that prior cases suggested otherwise, *Castro* explicitly overruled those holdings. *Id.*

In *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018), the Ninth Circuit extended *Castro*'s reasoning to claims of inadequate medical care. *Gordon* held that the proper standard of review for a pretrial detainee's inadequate medical care claim against an individual defendant was "one of objective indifference, not subjective indifference." *Id.* at 1120. To succeed on an inadequate medical care claim against an individual defendant, a pretrial detainee must now show:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125 (adopting *Castro*'s test for failure-to-protect claims) (citing *Castro*, 833 F.3d at 1071). The third element requires the individual defendant's conduct to be "objectively unreasonable," a

test that turns on the facts and circumstances of each case. *Id.* (citing *Kingsley*, 135 S. Ct. at 2473; *Castro*, 833 F.3d at 1071). Because the "mere lack of due care" by a government actor " does not deprive an individual of life, liberty, or property under the Fourteenth Amendment'," a plaintiff must " 'prove more than negligence but less than subjective intent—something akin to reckless disregard'." *Id.* (quoting *Castro*, 833 F.3d at 1071). In light of the new standard for individuals, the Ninth Circuit reversed the district court's summary judgment ruling in favor of municipal defendants on the *Monell* claim. *Id.*

Prior to *Gordon*, Ninth Circuit law held that pretrial detainees' Fourteenth Amendment claims for deliberate indifference to medical needs were governed by the same subjective standard as convicted prisoners' Eighth Amendment deliberate indifference claims. *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019). An officer was liable for deliberate indifference only if he knew of and disregarded an excessive risk to inmate health or safety—that is, he was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and actually drew the inference. *Id.* Deliberate indifference required an objective risk of harm and a subjective awareness of that harm. *Id.* at 600 (citation omitted).

In *Horton*, the Ninth Circuit explained that the "partially subjective standard has since been revised to an entirely objective standard for pretrial detainees." *Id.* (citing *Gordon*, 888 F.3d at 1125–26; *Castro*, 833 F.3d at 1068–71). As *Horton* explained, the Ninth Circuit adopted a new liability standard for pretrial detainees: "Fourteenth Amendment failure to protect claims must be analyzed under a *purely* objective standard." *Id.* at 602 (citing *Castro*, 833 F.3d at 1068–71). *Horton* further noted that *Gordon* extended the objective deliberate indifference standard to pretrial detainees' Fourteenth Amendment claims for violation of the right to adequate medical care. *Id.* (citing *Gordon*, 888 F.3d at 1125–26).

*Horton* also reaffirmed Ninth Circuit law holding that "municipal defendants may be liable under § 1983 even in situations in which no individual officer is held liable for violating plaintiff's constitutional rights." *Id.* at 604. Similarly, *Horton* confirmed that constitutional deprivations may occur as a result of collective inaction of the municipal defendant, rather than the actions of individual officers. *Id.* (quoting *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002)). A plaintiff

may prevail on a § 1983 claim against a municipal defendant if a reasonable jury might be able to conclude that he suffered a constitutional deprivation as a result of the collective inaction of the municipality, or of officers' adherence to departmental customs or practices. *Id.* (citing *Tsao*, 698 F.3d at 1143; *Long*, 442 F.3d at 1185–86; *Fairley*, 281 F.3d at 917).

In this case, NaphCare argues that *Gordon* does not apply because the newly announced standard only applies to claims against individual defendants. However, *Gordon* explicitly rejected this argument. *Gordon* involved claims against both individuals and municipal entities, and it overturned summary judgment on the *Monell* claim as improper in light of the new standard. The Ninth Circuit recently addressed *Gordon*'s applicability to municipal entities in *Crowell v. Cowlitz County*, 726 F. App'x. 593 (9th Cir. 2018) (unpublished). *Crowell* noted that *Gordon*'s new standard for deliberate indifference claims against individual defendants bears on a municipal liability claim "because, under its newly-announced standard for individual liability, [plaintiffs] may be able to show that one or more individuals violated their rights by exhibiting 'reckless disregard' for their well-being, and that those violations are attributable to Defendants." *Id.* at 594 (internal citation omitted). As *Crowell* explained, a municipal entity can be liable under § 1983 even when a plaintiff does not sue an individual defendant if the plaintiff shows (1) one or more individuals violated his rights by exhibiting "reckless disregard" for his well-being, and (2) those violations are attributable to the municipal entity. *Id.* at 594–95.

## C. The *Youngberg* and *Mink* Standard

Citing *Youngberg v. Romeo*, 457 U.S. 307 (1982) and *Oregon Advocacy Center v. Mink*, 322 F.3d 1101 (9th Cir. 2003), Plaintiffs assert that their claims should be evaluated under a lower gross negligence standard rather than the deliberate indifference standard because of Garrett's "mental incapacity." *Youngberg* and *Mink* considered the substantive due process rights of individuals detained by the state for the purpose of addressing issues related to their mental incapacity. In *Youngberg*, the Supreme Court held that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. at 321–22. Incapacitated or incompetent criminal detainees are also afforded more considerate treatment. *Mink*, 322 F.3d at

1119–21 (addressing Oregon's incompetency statute and holding that a state hospital's delay in admitting incapacitated detainees violates their due process rights).[7]

Plaintiffs argue that the court should apply the *Youngberg* and *Mink* gross negligence standard and hold that Garrett "had a constitutional right to mental healthcare that does not substantively depart from accepted professional judgment, practice or standards." Resp. (ECF No. 52) at 9:18–25 (citing *Clouthier*, 591 F.3d at 1243, *overruled in part on other grounds by Castro*, 833 F.3d 1060). However, Plaintiffs do not claim that Garrett received inadequate mental health care. Plaintiffs acknowledge that Garrett refused medication prescribed to treat his schizophrenia. Plaintiffs allege that the defendants did not provide adequate medical care to address Garrett's infection and cancer. Moreover, in *Clouthier*, the Ninth Circuit declined to apply the *Youngberg* and *Mink* standard to § 1983 claims brought by mentally ill pretrial detainees holding that deliberate indifference is the appropriate standard. 591 F.3d at 1243–44.

Finally, it is undisputed that Garrett had a long history of mentally illness and had suffered from paranoid schizophrenia since the age of 18 and had previously been found incompetent to stand trial in 2010. However, it is also undisputed that Garrett was found competent to stand trial in a competency evaluation at Lakes Crossing after his July 2014 arrest and incarceration at CCDC. Resp. Ex. 3 (ECF No. 52-3) at 7–13, Sept. 3, 2014 Competency Evaluation by Marv Glovinsky Ph.D; *see also* Resp. Ex. 1 (ECF No. 52-1) at 4, ¶ 7(o), Robert Gardner Decl. Plaintiffs cite no case applying *Youngberg* and *Mink* to § 1983 claims brought by mentally ill pretrial detainees who were found competent to stand trial. Deliberate indifference remains the standard in the Ninth Circuit. *Youngberg* and *Mink* do not apply. To prevail on their § 1983 claims, Plaintiffs must establish that the defendants acted with deliberate indifference to a substantial risk of harm.

Plaintiffs allege that NaphCare and LVMPD were deliberately indifferent to Garrett's

---

[7] Nevada law defines an "incompetent" criminal defendant as one who lacks "the present ability to: (a) Understand the nature of the criminal charges against the person; (b) Understand the nature and purpose of the court proceedings; or (c) Aid and assist the person's counsel in the defense at any time during the proceedings with a reasonable degree of rational understanding." NRS 178.400(2). If the court finds a "defendant incompetent, and dangerous to himself or herself or to society and that commitment is required for a determination of the defendant's ability to receive treatment to competency and to attain competence," the court "must order the sheriff to convey the defendant forthwith" into custody for detention and treatment at a secure facility. NRS 178.425(1). If a defendant's competency is restored, "the trial must proceed, or judgment may be pronounced, as the case may be." NRS 178.420.

medical needs and chose not to provide medical care despite their awareness he had serious medical conditions, which resulted in his hospitalization and death. Because there is no respondeat superior or vicarious liability under § 1983 for municipal entities or state actor contractors, Plaintiffs must prove that a NaphCare or LVMPD custom, policy, or practice amounting to deliberate indifference caused a violation of Garrett's constitutional right to adequate medical care.

## II.   ANALYSIS AND DECISION

Plaintiffs have not shown that NaphCare or LVMPD were deliberately indifferent to Garrett's constitutional right to adequate medical care while in custody at CCDC. The moving and responsive papers and voluminous exhibits supporting the parties' moving and responsive papers do not contain any admissible evidence that any LVMPD/CCDC corrections officer or staff member at CCDC or any NaphCare medical, mental health provider, or staff member was aware of Garrett's undiagnosed melanoma or infection or any associated symptoms prior to January 21, 2015, the day Officer O'Barr observed Garrett on the floor and summoned medical care.

### A.  Mr. Gardner's Declaration

Plaintiff Robert Gardner, Garrett's father, submitted a declaration in support of Plaintiffs' responses to both defendants' motions for summary judgment. Mr. Gardner avers that Garrett had his first incidence of schizophrenic disorder at age 18. Resp. Ex. 1 (ECF No. 51-1), Decl. at 2–4, ¶ 7. Garrett was subsequently diagnosed with "schizophrenia paranoia, pervasive thought disorder, and learning and memory disorders," and prescribed many different medications over his life. *Id.* Beginning in August 2006, Garrett was in and out of lockdown psychiatric hospitals in Southern California, some court-ordered and others paid for by the family who would visit him regularly and often. *Id.*

In April 2010, Garrett went missing from Redwood Cove Board and Care, a National Alliance on Medical Illness, adult residential facility, and the family filed a missing-persons report and frantically searched for him. *Id.* In mid-2010, Garrett was arrested in Las Vegas and sent to Lakes Crossing where he was declared not competent. *Id.* The charges in his 2010 criminal case, Case No. 10F14561X, were dismissed and Garrett was sent to the Rawson-Neal Psychiatric Hospital in Las Vegas for a brief hold. *Id.* Garrett ended up in San Diego following his release

from Rawson-Neal. *Id.* Within a short time, while the family did not know his whereabouts, Garrett jumped off a building badly injuring himself and spent several months in a hospital at USC for a broken pelvis, broken ribs, a punctured lung, broken leg, and other miscellaneous injuries. *Id.* Garrett was then transferred to UCSD psychiatric hospital, and after months of medication and stabilization, he was subsequently transferred to the lockdown facility at Metro State Hospital on June 27, 2011. *Id.* In September 2011, Garrett escaped and fled to Nevada. *Id.*

Mr. Gardner's declaration outlines the family's anguish in trying to help their son during the three years leading up to his 2014 incarceration at CCDC. *Id.* In the summer of 2014 after Garrett was arrested, he was sent to Lakes Crossing, and despite his earlier diagnosis from the same hospital, Garrett was found competent. *Id.* at 4, ¶ 7(o). The affidavit outlines the family's contact with Garrett's public defender in anticipation that he would soon be released only to have the next hearing pushed out or delayed. *Id.* at 4–5, ¶¶ 8–10. Mr. Gardner and his son, Ryan traveled to Las Vegas for one of Garrett's court hearings approximately six weeks to two months before Garrett passed away. *Id.* at 5, ¶ 9. Although Mr. Gardner was only able to look at Garrett momentarily while he walked in and Garrett was the furthest front seat away from the gallery, Mr. Gardner observed that "Garrett looked extremely unwell." *Id.* Garrett appeared thin, pale, and disheveled from a distance, which troubled Mr. Gardner and his son Ryan. *Id.*

The declaration relates that the public defender's office advised the family that Garrett's upcoming hearing date had been reset because Garrett had a staph infection and was sent to UMC for treatment. *Id.*, ¶ 10. Mr. and Mrs. Gardner called UMC on several occasions and were told that no one with their son's name was at UMC or had been at UMC. *Id.*, ¶ 11. The family was therefore shocked when the Orange County Sheriff's Office advised them that Garrett had died. *Id.* at 6, ¶ 12.

Mr. Gardner's declaration describes how he and his wife left no stone unturned to learn about Garrett's mental illness and attempt to help him over the years. *Id.* at 6–7, ¶¶ 13–14. Mr. Gardner describes his son as a kind, gentle, loving, and very funny person who played sports and loved goofing around with his brother and sister. *Id.* at 7, ¶ 15. Mr. Gardner and his wife would have gone to any lengths to battle Garrett's melanoma if they had been given the opportunity. *Id.*,

24

¶ 16. The family believes that their son's life was cut short by the deliberate indifference of the jail staff and NaphCare while he was in their custody and care. *Id.*

**B. Summary of Admissible Evidence**

Although Mr. Gardner's declaration attests that he and his son Ryan observed Garrett in court six to eight weeks before his death and thought he looked unwell, there is nothing in the declaration or the record suggesting the family notified CCDC or NaphCare staff or anyone else of their concern for Garrett's health or need for medical evaluation or treatment. CCDC records of Garrett's contact with his family establish that Garrett did not complain of any medical condition, that he felt unwell, or wanted medical attention. *See* Mot. Ex. R (ECF No. 48-18), Chart of Outside Contacts & CCDC Visitor Logs (LVMPD 0305–0306).

A NaphCare registered nurse conducted an initial health screen and physical assessment when Garrett was booked into CCDC. Mot. Ex. M (ECF No. 48-13). The nurse noted that Garrett was 5'11" and weighed 149 pounds. *Id.* He was oriented to "person, place, time, and situation." *Id.* His behavior, perception and demeanor were appropriate. *Id.* On physical exam no injuries were noted. *Id.* There were no abnormal findings in the cardiovascular, respiratory, abdominal, musculoskeletal, and skin exams. *Id.* There were no symptoms of tuberculosis. *Id.*

A nurse also gave him a medical evaluation and noted his mental illness. During the six months of his incarceration at CCDC Garrett repeatedly reported suicidal ideation and at times refused his medications. Medical records attached to the parties' moving and responsive papers establish that between July 20, 2014, and January 21, 2015, Garrett was seen by multiple NaphCare health care providers—nurses, psychiatric nurses, psychiatrists, and other mental health providers more than 60 times. Mot. Exs. D & F (ECF Nos. 48-4, 48-5). After expressing suicidal ideation to CCDC and/or NaphCare staff, Garrett was transferred to segregated psychiatric ("psych") housing four times and twice placed on suicide watch.

On January 18, 2015, Garrett was evaluated by a mental health provider and placed on suicide watch because officers reported he was having suicidal ideation and appeared depressed in the dayroom. On January 19th, he was seen by a psychiatrist while in isolation who noted Garrett was moderately cooperative, wearing a suicide blanket while lying on the floor. Mot. Ex. F (ECF

25

No. 48-6), LVMPD000939. He had minimal anxiety and stated he had some intermittent suicidal thoughts the day before but was no longer suicidal and wanted to return to general population. *Id*. On a review of symptoms, the psychiatrist noted his anxiety was minimal, and his appetite, energy and focus were fair. He was seen by a nurse on January 20th, denied any mental health issues or thoughts of self-harm and reported he was eating and sleeping well. *Id.*, LVMPD000927. A follow up appointment was scheduled. *Id.* Later that day, a social worker attempted to evaluate Garrett as a follow up after the suicide watch ended, but Garrett refused to respond to the door as requested by a corrections officer and the social worker.

On January 21st, Garrett ate breakfast and lunch. *Id.*, LVMPD000926. However, while Officer O'Barr entered Garrett's cell to deliver his dinner tray, he noticed Garrett lying on the floor and smelled the odor of urine and feces. Mot. Ex. K (ECF No. 48-10), O'Barr Dep. Tr. at 23:25–24:2. O'Barr asked Garrett if he was okay and he responded yes. *Id.* at 24:14–16. O'Barr told him to get up but summoned medical when Garrett would not get up. *Id.* at 24:16–18. O'Barr noticed that Garrett's skin color was extremely pale, and his right arm was swollen, and he wasn't able to fully get up. *Id.* at 24:19–25:2. O'Barr called the NaphCare nurse on duty. *Id.* at 25:18–22. The NaphCare records show a nurse noted Garrett was seen at the request of O'Barr, who noticed he appeared weak while handing out dinner trays. Mot. Ex. F (ECF No. 48-6), LVMPD000926. Garrett said he had not gotten out of bed in three days and was weak. *Id*. Garrett was assessed, complained of generalized pain, was oriented times three, but appeared weak, thin, and pale. *Id.* His head was atraumatic, his CVS regular but tachycardic, feces noted on pants and bed. *Id.* Edema was noted to right arm and Garrett reported he did not know what happened. *Id*. Garrett was unable to raise both legs. *Id.* A crash cart was requested as soon as possible, an IV was started, and Garrett was transported to UMC's ER by ambulance.

UMC medical records indicate that after the initial examination, a doctor at UMC concluded Garrett's symptoms stemmed from a "necrotizing fasciitis" bacterial infection. Resp. Ex. 17 (ECF No. 52-17). Immediate surgery was recommended to remove the infection from his chest wall that was observed after a chest CT scan was performed. Garrett initially refused surgery but agreed to take antibiotics. Within 24 hours of refusing the surgery, Garrett changed his mind

and allowed the doctors to operate. During the surgical procedure, dark lumps were observed inside Mr. Gardner's body and biopsied. Biopsy results revealed that Garrett was suffering from stage four metastatic malignant melanoma. Garrett continued to receive treatment at UMC after the surgery. He initially improved, but then rapidly deteriorated. He died on January 31, 2015, ten days after he was admitted to the hospital.

The Clark County Coroner's Office conducted an autopsy after Garrett's death. Mot. Ex. O (ECF No. 48-15). An external examination of the body revealed a normally developed white male. *Id*. No external signs of melanoma were noted. *Id*. The presence of melanoma was confirmed on several internal organs. *Id*. The Medical Examiner concluded the immediate cause of death was metastatic malignant melanoma with polymicrobial sepsis listed as a significant contributing condition. *Id*.

Dr. Allan Greenberg, a salaried physician working for UMC at the time of Garrett's admission, was deposed in this case. Resp. Ex. 4 (ECF No. 52-4), Greenburg Dep. Tr.[8] He testified he was asked to consult on Garrett's case because it was thought Garrett had a rapidly progressive soft tissue infection, and he was asked to consult on antibiotics. *Id*. at 10:6–12. The diagnosis of necrotizing fasciitis was suggested after a CT scan in the ER, "which demonstrated there was gas in those deep soft tissues and evidence of tissue death or necrotizing injury to that tissue." *Id*. at 10:24–11:5. Necrotizing fasciitis is very unusual outside of trauma or where there is disruption of the external skin, and there was no evidence of that on physical exam. *Id*. at 11:6–14. The hypothesis was that Garrett was suffering from an underlying condition and a superimposed or a secondary infection, which resulted in significantly increased symptoms and hospitalization. *Id*. at 12:1–6. The underlying condition was exacerbated by the secondary infection; the secondary infection was believed to have come on within 48 hours preceding Garrett's admission. *Id*. at 12:11–17. When Dr Greenberg first saw Garrett, he was "surprisingly alert because most people by that time are "obtunded," *i.e.*, desensitized or mentally clouded or dulled. *Id*. at 16:4–6. He needed emergency surgical intervention to remove the dead tissue and drain as much infected

---

[8] The copy of Dr. Greenberg's deposition transcript attached to Plaintiffs' opposition includes the case caption and certificate of the court reporter.

tissue as possible, which usually identifies the source. *Id.* at 16:9–12. Medical records show debridement was done and a biopsy was taken, but doctors were not able to identify the source. *Id.* at 16:24–17:8. Dr. Greenberg believed the source was in the stomach or gut. *Id.* at 17:10–11, 22:15–25

After the surgery, there was no evidence of necrotizing fasciitis and Garrett was much better. *Id.* at 20:14–17, 21:19–21. Garrett was not feverish and was not "clinically toxic"; blood cultures revealed polymicrobial sepsis and other "bugs," a staphoreous, and multiple nodes the source of which was unclear. *Id.* at 23:1–13. The bacterial infection resolved while Garrett was at UMC. *Id.* at 26:7–13. The sepsis from the infection was resolved by January 26th. *Id.* at 27:8–15. From the discharge summary Dr. Greenberg believed Garrett had progressive new masses "which meant that his malignancy … was galloping aggressively … and they asked oncology to see him." *Id.* at 27:17–25. "Oncology felt here was no curative or even meaningful palliative chemotherapy." *Id.* at 28:2–3. Dr. Greenberg therefore surmised the cause of death on the death certificate would be "disseminated aggressive melanoma," *Id.* at 28:5–6.

Dr. Greenberg testified the infection was a secondary event that "accelerated the course of his illness and brought him into the hospital." *Id.* at 37:25–38:2. He opined that the infection "supervened within 72 hours of the admission to the hospital," meaning it was not going on for longer than 72 hours prior to Garrett's admission to UMC. *Id.* at 43:18–44:14. Dr. Greenberg explained that doctors later learned that the underlying condition accelerated by the infection was melanoma, which "was probably going on for a longer period of time." *Id.* at 49:11–17. He opined that the melanoma "likely caused a perforation injury in the gut that led to the infection." *Id.* at 49:25–50:2.

**C. Decision**

If a constitutional deprivation occurs as a result of the collective inaction of municipal employees, a municipality may be liable under § 1983 even though no individual employee is held liable. *Horton*, 915 F.3d at 604. Plaintiffs' claim that defendants were unaware of Garrett's metastatic melanoma and polymicrobial sepsis but chose not to provide medical care. To impose *Monell* liability for NaphCare or LVMPD's omissions or failure to act, Plaintiffs must demonstrate

28

that: (1) a NaphCare or LVMPD employee violated Garrett's constitutional rights; (2) NaphCare or LVMPD has customs or policies that amount to deliberate indifference; and (3) these customs or policies were the moving force behind the NaphCare or LVMPD employee's violation of Garrett's constitutional rights. *See Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). To prove the first element—that a NaphCare or LVMPD employee violated Garrett's right to adequate medical care, Plaintiffs must satisfy *Gordon*'s four prongs: (i) a NaphCare or LVMPD employee made an intentional decision with respect to the conditions under which Garrett was confined; (ii) those conditions put Garrett at "substantial risk of suffering serious harm"; (iii) a NaphCare or LVMPD employee "did not take reasonable available measures to abate that risk," even though a reasonable employee in those circumstances would have "appreciated the high degree of risk involved"—making the consequences of NaphCare or LVMPD's customs or policies "obvious"; and (iv) by not taking such measures, NaphCare or LVMPD caused Garrett's injuries. *Gordon*, 888 F.3d at 1125; *Castro*, 888 F.3d at 1176–77.

Here, LVMPD and NaphCare's summary judgment motions demonstrate that Plaintiffs do not have evidence of a constitutional violation—an essential element of their *Monell* claim. Thus, they have not shown a genuine issue of fact for trial. *See Celotex*, 477 U.S. at 323–24. The only admissible medical opinion testimony in the record establishes that Garrett's malignant melanoma caused his bacterial infection, which was initially diagnosed as necrotizing fasciitis after a CT was performed in the ER. There was no evidence of disruption of the external skin or necrotizing fasciitis on physical exam. Dr. Greenberg opined that the infection and sepsis was caused by the malignant melanoma, originated in the gut or stomach, and was resolved by January 26, 2015, several days before Garrett's death on January 31st. Dr. Greenberg opined the cause of death was disseminated aggressive melanoma. He further opined that the infection occurred between 48 and 72 hours prior to Garrett's hospitalization. The coroner concluded that Garrett's cause of death was metastasizing malignant melanoma with polymicrobial sepsis as a contributing cause.

Plaintiffs' complaint alleges that Garrett was suffering from "polymicrobial sepsis and metastatic melanoma, which ultimately caused the untimely death," but NaphCare and LVMPD "chose not to provide medical care." There is no admissible evidence in the record that any

29

LVMPD or NaphCare employee made an intentional decision regarding Garrett's conditions of confinement and the risks involved with failing to treat his medical needs. There is also no evidence in the record that Garrett's melanoma and infection were "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *See Palacios v. City of Oakland*, 970 F. Supp. 732, 741 (N.D. Cal. 1997), *aff'd*, 152 F.3d 928 (9th Cir. 1998).[9] Plaintiffs have no evidence that either condition was discovered or obvious before the evening of January 21, 2015, when Officer O'Barr observed Garrett lying on the floor of his cell and immediately requested a medical assessment. Garrett was seen by NaphCare's medical or mental health providers over 60 times at CCDC in addition to regular observation by corrections officers.[10] On January 19th, a psychiatrist evaluated Garrett, noting both his mental and physical state. On January 20th, Garrett was seen by a nurse. He denied mental health issues and reported he was sleeping and eating well. On January 21st, Garrett ate his breakfast and lunch. It wasn't until Officer O'Barr passed out dinner trays later in the day that Garrett exhibited obvious signs of a medical problem. There is no evidence in the record creating a triable issue of fact that medical staff or corrections officers observed obvious signs or symptoms of a serious medical need before then.

In addition, Plaintiffs have no medical opinion evidence that Garrett's infection or metastatic melanoma could have been detected and treated before the evening of January 21st. Rather, Plaintiffs attach photocopies the autopsy photographs to their oppositions and argue that "it is impossible to imagine" from the post mortem condition of the body that someone would not have noticed Garrett was obviously suffering from a serious medical condition. There is no testimony or other evidence in the record, let alone medical opinion testimony interpreting the autopsy photos or opining that the post mortem condition of the body indicates that a serious medical condition was obvious before the evening of January 21st.

---

[9] *See also Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004) ("Most other circuits hold that a medical need is objectively serious if it is one that has been diagnosed by a physician . . . *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

[10] Observations by corrections staff increased while Garrett was in psych housing and further increased to 15-minute intervals while on suicide watch.

Viewed in the light most favorable to Plaintiffs, applying an objective standard, the evidence produced does not demonstrate a constitutional violation of Garrett's right to receive adequate medical care. There is simply no evidence in the record indicating that Garrett was exhibiting symptoms of a bacterial infection, malignant melanoma, or any other serious medical condition before January 21, 2015. The only medical records and testimony in the record establish that there were no external indicia of an infection until a CT scan was done at the hospital. The malignant melanoma was not diagnosed until doctors performed surgery to treat the infection and took a biopsy of the dark lumps they observed inside Garrett's body. Plaintiffs have failed to establish a violation of Garrett's right to receive adequate medical care. Because Plaintiffs lack evidence to show that Garrett suffered a constitutional violation, LVMPD and NaphCare are entitled to summary judgment, and the court need not address plaintiffs' remaining arguments.

Accordingly,

**IT IS ORDERED:**

1. Defendant NaphCare's Motion for Summary Judgment (ECF No. 47) is **GRANTED**.

2. Defendant Las Vegas Metropolitan Police Department's Motion for Summary Judgment (ECF No. 48) **GRANTED**.

3. The Clerk of the Court is directed to enter judgment for NaphCare and LVMPD.

Dated this 29th day of April, 2019.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE